

FILED

NOV 2 0 2008

CLERK

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

NORTHERN DIVISION

*********************************************************************************

|  |  |  |
|---|---|---|
| ESCO MFG., a corporation | * | CIV 07-1026 |
|  | * |  |
| Plaintiff, | * |  |
|  | * | OPINION AND ORDER |
| -vs- | * |  |
|  | * |  |
| ADVANCE SIGN GROUP, LLC, a Limited | * |  |
| Liability Company and THE WASSERSTROM | * |  |
| GROUP, LLC, a Limited Liability Company, | * |  |
|  | * |  |
| Defendants. | * |  |
|  | * |  |

*********************************************************************************

Plaintiff instituted this action for breach of contract in South Dakota Circuit Court. Defendants removed the matter to federal court on the basis of diversity and filed counterclaims alleging breach of contract. Plaintiff has filed a motion for summary judgment on their claim and as to the defendants' counterclaims. The matter is now ready for decision.

## DECISION

"A motion for summary judgment should be granted only if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law." Turner v. Holbrook, 278 F.3d 754, 757 (8th Cir. 2002), Fed. R. Civ. P. § 56(c). "In order to establish a genuine issue of material fact," the non-moving party, the defendants here, can "not 'simply rest upon the pleadings'" nor can "he rely on conclusory statements in his affidavit." Jeseritz v. Potter, 282 F.3d 542, 545 (8th Cir. 2002) (quoting Mathews v. Trilogy Communications, Inc., 143 F.3d 1160, 1164 (8th Cir.1998)). Rather, he must "point to evidence in the record sufficient to raise a genuine issue for trial." Jeseritz v. Potter, 282 F.3dd at 546 (quoting Mathews, 143 F3d. at 1164).

The parties do not dispute that, on various dates, ESCO MFG. ("ESCO") prepared "sales order acknowledgement forms" for signs to be manufactured for Advance Sign Group ("Advance"), a Columbus, Ohio, entity which is a wholly owned subsidiary of the Wasserstrom

Group. The signs (75 or 78) were to be manufactured by ESCO in South Dakota, which signs Advance intended to in turn deliver to its customer, Huntington National Bank, in Ohio. The total estimated purchase price for the signs was apparently $218,021.00. The only documents submitted by the parties setting forth the terms of the contracts were the "Sales Order Acknowledgement" forms prepared by ESCO and various e-mails. The forms show various dates. ESCO claims that a date of August 22, 2007, represents the date the prototypes would be ready and October 1, 2007, represents the date the actual signs would be ready. Exhibit 5 shows an order date of August 6, 2007, and the form then states "Need BY: (See Below)." The only date shown below on page one of Exhibit 5 is August 22, 2007. The forms are very imprecise and were not signed by anyone. It is amazing that two sophisticated parties would be so careless in supposedly entering into special manufacturing contracts involving more than $200,000.00. The use of e-mails is akin to a curse in trying to decipher the intentions of parties, especially after orders have been placed and accepted.

Advance claims that various telephone conversations occurred. Advance claims to have told ESCO that the $112,262.00 (down payment) was being paid and the signs ordered with the understanding that the signs would be shipped within "about" three weeks. More specifically, Advance claims to have told ESCO that all signs must be in Ohio by the week of September 17, 2007, and ESCO assured Advance the signs "could be" delivered by that week. Advance claims to have made clear to ESCO that the ultimate purchaser, the Huntington Bank, needed the signs by that week.

Prior to August 6, 2007, and thereafter, the parties exchanged e-mail or oral communications concerning project specifications, change orders, and shipping. The e-mail trail was not limited to one representative from each company. Therefore, for clarity I will not refer to the names of the authors of the e-mails but simply indicate which party to the contract sent the e-mails.

In July 2007, prior to the agreed contract date of August 6, 2007, Advance inquired as to the "lead time" for the work. ESCO responded that the lead time would be approximately three weeks. In other words, all signs would be manufactured and ready for shipment within that time frame. On August 2, 2007, Advance sent a down payment to ESCO in the amount of

2

$112,262.00. On August 21, 2007, Advance inquired by e-mail when ESCO would begin shipping the signs. ESCO responded that ship dates would be available the following week. On August 28, 2007, Advance again asked for an "update of the Huntington cabinet's [sic]," inquiring "where do we stand?" ESCO responded with details on the production and again stated that ESCO would get Advance a ship date "this week." On September 10, 2007, Advance again requested "an update for our Huntington signs." ESCO responded that same date, advising ESCO would begin shipping the signs "this week."

ESCO delivered six signs on September 19, 2007.

On September 17, 2007, Advance sent an e-mail to ESCO, inviting ESCO to call "so we can talk about getting some of your signs shipped." The parties do not dispute that, later that day, ESCO responded to Advance setting forth the dates that ESCO would ship the remaining signs to Advance:

| September 21: | 15 signs |
|---|---|
| September 28: | 27 signs |
| October 5: | 29 signs |

On September 19, 2007, Advance sent an e-mail to ESCO, setting forth certain changes in the quantity required. ESCO replied that same date with a clarification of the order details. That e-mail provided "Our present production schedule is per the email dated 9/17/07. . . If I have misstated any critical aspect of the above items, or further clarification is required, please advise immediately." Later that day, ESCO sent another e-mail to Advance, memorializing their e-mail and telephone conversations regarding fabrication, delivery, and pricing, although no delivery date was set forth.

On September 24, 2007, ESCO sent an e-mail to Advance, memorializing again that there had been change orders and cancellation as to certain quantities. ESCO stated in this e-mail that:

> To proceed without further delay, ESCO requires:
> Your written confirmation of the documents provided on 9/19/07, which are:
> 1) Original Sales Order Verifications which includes product specifications and other information
> 2) Acknowledgement (sic) of the Terms Letter
> 3) Approval of Pricing Summary.
> * * *

3

> If the documents are acceptable, you may simply acknowledge by return email. Or, alternatively, advise of any concerns immediately.

On September 25, 2007, Advance e-mailed ESCO, stating:

> Your interpretation of the quantity to be fabricated is correct . . . In general your Pricing Summary looks correct . . . Terms are acceptable. Under any circumstance we will cut a check for $63,391.32 this Friday for delivery to you by early next week. Please proceed aggressively on completion of our order.

On September 27, 2007, ESCO sent an e-mail to Advance, clarifying that the unpaid price, including shipping, was then $70,483.32. On October 1, 2007, Advance sent an e-mail to ESCO which provided:

> A check for $70,483.32 was cut on Friday but not sent pending a hold order Advance Sign received from Huntington on the 9'6" X 6'2" signs. Please hold further work on these signs while we attempt to define the situation with Huntington . . . I will keep you informed of any new developments.

Because of the claimed delays, Huntington on September 28, 2007, terminated (whether legally effective or not, we do not know) its contract with Advance for the 29 signs not yet finished or shipped. Apparently, to the present date, the 29 signs have not been manufactured or shipped. Thus, any claimed shipping date of October 5, 2007, has long passed. There is no evidence of any tender within the claimed shipping date. A question exists whether ESCO was insisting on adding a term to the contract to require pre-payment before shipping. Questions of law, of facts, and of equity exist in this case.

The record is not a model of clarity but apparently, 15 signs were shipped on September 21, 2007, and 27 signs were shipped on September 28, 2007. Adding these to the five "previous signs" provides a total of 47 signs provided to Advance by ESCO.

ESCO responded later on October 1, 2007, stating that the amount due was now $72,847.32 based upon having to ship certain signs on two trucks rather than one. Some oral communications must have ensued because that evening ESCO sent an e-mail to Advance as follows:

> To say the least, I am shocked and concerned regarding this latest development. However, per your instructions the order for the (29) 72.5" X 144" units is now on hold. Please note that in order to meet the

4

intended ship date of 10/5/07, we had scheduled employees to work this evening and before normal hours tomorrow morning. This work has now been cancelled. Accordingly, we are no longer in a position to ship the balance of this order by 10/5/07. At this time, ESCO will calculate our costs for the value we have into the project to this point. Because we were just a few days from completing the entire project, I believe it is safe to say that the bulk of the $108,119.32 (the balance due on the product and freight charges incurred to this point) will be due and payable. I will be calling you tomorrow to discuss this in greater detail. I would be looking for assurances that ESCO will be paid in full regardless of Huntington Bank's decision on the disposition of the 72.5" X 144" signs.

Advance responded on October 2, 2007:

We were as astonished as you were. I understand your position in respect to payment. We should know more following our meeting on Wednesday.

On October 7, 2007, Advance put the balance of the order "on hold."

Advance contends now that all signs were to be delivered by the week of September 17, 2007.

ESCO contends that it is owed $95,994.54 for the balance owing on the contract for work done.

Advance contends that the signs were to be delivered by no later than September 22, 2007. Advance complains that, on September 28, 2007, Huntington canceled its order with Advance as to the remaining 29 signs, resulting in damages to Advance in the amount of $81,000.00, allegedly caused by ESCO's delays.

The governing substantive law in a case removed to federal court in South Dakota based on diversity of citizenship is South Dakota law. Hartford Accident and Indemnity Co. v. Stauffer Chemical Co., 741 F.2d 1142, 1145 (8th Cir. 1984). The contract or contracts for the sale and purchase of the signs at issue here would constitute a contract for the sale of goods, governed by the Uniform Commercial Code ("UCC"). SDCL 57A-2-105. Generally, the South Dakota statute of frauds provides that an oral contract for the "sale of goods for the price of five hundred dollars or more is not enforceable . . . unless there is some writing sufficient to indicate that a contract for sale has been made between the parties." SDCL 57A-2-201(1). However, the merchant exception to the statute provides:

5

(2) Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within ten days after it is received.

(3) A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable

(a) If the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement; or

(b) If the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted; or

(c) With respect to goods for which payment has been made and accepted or which have been received and accepted (§ 57A-2-606).

SDCL 57A-2-201 (2), (3).

The parties here are clearly merchants. SDCL 57-2-104(1). Whether the parties have satisfied the statute of frauds is a question of law. Melford Olsen Honey, Inc. v. Adee, 452 F.3d 956, 961 (8th Cir. 2006).

The parties do not dispute that a contract or contracts existed. In any event, the written communications between the parties together with the Sales Order Acknowledgment forms clearly show that a contract or contracts existed. There is no genuine issue of material fact that a contract or contracts existed.

The parties dispute at least one of the terms of the contract, the date required for shipment of the goods. The South Dakota version of the UCC provides:

(1) The time for shipment or delivery or any other action under a contract if not provided in this article or agreed upon shall be a reasonable time.

SDCL 57A-2-309.

What is a reasonable time is an issue of fact for the jury.

6

The UCC further provides:

(1) An agreement for sale which is otherwise sufficiently definite (subsection (3) of § 57A-2-204) to be a contract is not made invalid by the fact that it leaves particulars of performance to be specified by one of the parties. Any such specification must be made in good faith and within limits set by commercial reasonableness.

(2) Unless otherwise agreed specifications relating to assortment of the goods are at the buyer's option and except as otherwise provided in subsections (1)(c) and (3) of § 57A-2-319 specifications or arrangements relating to shipment are at the seller's option.

(3) Where such specification would materially affect the other party's performance but is not seasonably made or where one party's cooperation is necessary to the agreed performance of the other but is not seasonably forthcoming, the other party in addition to all other remedies

(a) Is excused for any resulting delay in his own performance; and
(b) May also either proceed to perform in any reasonable manner or after the time for a material part of his own performance treat the failure to specify or to cooperate as a breach by failure to deliver or accept the goods.

Assuming that Advance is correct in its claim that the parties agreed orally to a delivery date of not later than the week of September 17, 2007, did the parties later agree to alter such claimed deadline? Was consideration required to alter the claimed oral agreement? If so, was there any consideration? Questions of impossibility of performance, cover, mitigation of damages, and frustration of purpose all exist.

Advance offers evidence by affidavit that the shipping date was set forth orally in conversations between Advance and ESCO. Pursuant to SDCL 57A-2-202 parties to a contract are barred from bringing evidence of any oral agreement which contradicts the terms of a final, written contract. However, an agreement may be explained or supplemented by oral evidence of course of dealing or course of performance by the parties or of "consistent additional terms unless the court finds the writing to be intended also as a complete and exclusive statement of the terms of the agreement." *See also* Northwestern Public Service Co. v. Chicago & North Western Railway, 210 NW2d 158, 160 (S.D. 1973) ("parol evidence is inadmissible to vary, contradict or add to a contract which has been reduced to a writing that is clear, definite and complete, and in

7

the absence of fraud, mistake or accident, it will be presumed that the written agreement expresses the final intention of the parties upon the subject matter of the contract").

Generally, "the meaning of an unambiguous contract presents a question of law appropriate for summary judgment" while "the interpretation of an ambiguous contract presents a question of fact, thereby precluding summary judgment." McCormack v. Citibank, N.A., 100 F.3d 532, 538 (8th Cir. 1996) (a case out of Nebraska), (*quoting* Michalski v. Bank of Am. Ariz., 66 F.3d 993, 996 (8th Cir. 1995) (a case out of Minnesota)). I find in this case that the contract or contracts at issue here are ambiguous as to one of the terms, that is, the time of delivery.

SDCL 53-10-2 provides: "If no time is specified for the performance of an act, a reasonable time is allowed. If the act is capable of being done instantly, such as payment of money, it must be performed immediately when due and ascertained." SDCL 53-10-3 provides: "Time is never considered as of the essence of the contract, unless by its terms expressly so provided." Apparently, Advance contends that time was of the essence of the contract or contracts. There is, however, no recitation in any of the documents that time "is of the essence." Advance claims that the parties agreed orally at the very inception of the relationship that time was, in effect, of the essence. There is nothing in the written documents (as would be found if drafted by an attorney) specifying that any prior or contemporaneous oral agreements or representations are superseded by the written contract or contracts. Genuine issues of material fact exist as to these and other questions.

**ORDER**

Now, therefore,

IT IS ORDERED that plaintiff's motion for summary judgment, Doc. 24, is denied.

Dated this 20th day of November, 2007.

BY THE COURT:

CHARLES B. KORNMANN
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK

BY: _____
                    DEPUTY
        (SEAL)

8